**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>TIM EYMAN, individually, as committee officer for Voters Want More Choices - Save the 2/3s and Protect Your Right to Vote on Initiatives, and as principal of TIM EYMAN WATCHDOG FOR TAXPAYERS, LLC; TIM EYMAN WATCHDOG FOR TAXPAYERS, LLC, a Washington limited liability company,<br><br>Appellants,<br><br>WILLIAM AGAZARM, individually and as a principal of CITIZEN SOLUTION LLC, a Washington limited liability company; and CITIZENS SOLUTIONS LLC, a Washington limited liability company,<br><br>Defendants. | No. 56653-2-II<br><br><br>ORDER DENYING MOTION FOR RECONSIDERATION AND AMENDING OPINION |

Appellant Tim Eyman moves for reconsideration of the court's December 6, 2022 published opinion. Upon consideration, the court denies the motion. In addition, the court awards attorney fees to the State under RCW 42.17A.780.

The court further orders that the following sentence be deleted from page 20 of the court's opinion: "At no time after February 10 did Eyman object to or attempt to challenge the findings of fact or argue that he did not receive five days' notice."

Accordingly, it is

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56653-2-II

**SO ORDERED.**

**PANEL:** Jj. Maxa, Lee, Cruser

**FOR THE COURT:**

_____
MAXA, P.J.

We concur:

_____
LEE, J.

_____
CRUSER, A.C.J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56653-2-II |
| Respondent, | |
| v. | |
| TIM EYMAN, individually, as committee officer for Voters Want More Choices - Save the 2/3s and Protect Your Right to Vote on Initiatives, and as principal of TIM EYMAN WATCHDOG FOR TAXPAYERS, LLC; TIM EYMAN WATCHDOG FOR TAXPAYERS, LLC, a Washington limited liability company, | PUBLISHED OPINION |
| Appellants, | |
| WILLIAM AGAZARM, individually and as a principal of CITIZEN SOLUTION LLC, a Washington limited liability company; and CITIZEN SOLUTIONS LLC, a Washington limited liability company, | |
| Defendants. | |

MAXA, P. J. – Tim Eyman and Tim Eyman Watchdog for Taxpayers, LLC (collectively Eyman) appeal the trial court's ruling that Eyman engaged in multiple violations of the Fair Campaign Practices Act (FCPA), the imposition of a monetary penalty of over $2.6 million, and an injunction prohibiting Eyman from engaging in a wide range of activities. The violations arose from four incidents.

First, Eyman filed initiative 1185 in 2012 and served as an officer on the campaign committee. The committee hired Citizen Solutions to collect signatures to help I-1185 qualify to

No. 56653-2-II

be on the ballot, agreeing to pay a fixed price per signature. Eyman agreed with Citizen Solutions to increase the price per signature twice during the campaign. The committee reported all payments to Citizen Solutions to the Public Disclosure Commission (PDC). After the I-1185 campaign ended, Citizen Solutions paid Eyman $308,185.50. Neither the campaign committee nor Eyman reported the payment to the PDC.

Second, Eyman filed initiative 517 later in 2012, and served as an officer on the campaign committee. Eyman paid $200,000 to Citizens in Charge, characterizing it as a loan. Citizens in Charge then provided $182,806 of in-kind signature gathering services to the I-517 campaign. Citizens in Charge later paid Eyman $103,000, which was characterized as repayment of the loan. The committee reported Citizens in Charge's in-kind donation to the PDC, but Eyman did not report the loan or the payment he received.

Third, in 2017 Eyman's political committee was owed a $23,008 refund from Databar, Inc., a vendor. Instead of the refund being returned to the committee, the refund was transferred to Eyman's personal account. Neither the committee nor Eyman reported this payment.

Fourth, Eyman solicited donations from supporters to pay for his living expenses. The donations were not for any specific initiative campaign, but Eyman communicated that he needed the donations to continue working on ballot initiatives. He received over $800,000 in donations, which he used for personal purposes. Eyman did not register as a political committee or a continuing political committee or report any of these donations to the PDC.

Following a bench trial, the trial court ruled that Eyman violated the FCPA by failing to report to the PDC (1) that certain payments made to Citizen Solutions were to pay Eyman rather than for signature gathering, (2) the loan he made to Citizens in Charge and the payment he received from Citizens in Charge, (3) the Databar refund he received, and (4) the personal

4

contributions he received. The court imposed a civil penalty against Eyman totaling over $2.6 million and awarded over $2.8 million in reasonable attorney fees and costs to the State. The court also issued an injunction, precluding Eyman from engaging in certain activities regarding political committees and from receiving any gifts or donations without establishing a political committee.

We hold that (1) the trial court did not err in ruling that Eyman violated the FCPA by improperly reporting and concealing the $308,185.50 payment from Citizen Solutions, (2) the trial court did not err in ruling that Eyman violated the FCPA by making $200,000 in loans to Citizens in Charge to use to support I-517 and thereby concealing the source of his contributions to I-517, (3) the trial court did not err in ruling that Eyman violated the FCPA by failing to report his receipt of the $23,008 Databar refund, (4) the trial court did not err in concluding that Eyman's receipt of personal contributions to allow him to work on ballot initiatives made him a "political committee" and a "continuing political committee" and therefore that Eyman violated multiple reporting requirements, (5) the FCPA is not unconstitutional as applied to Eyman, (6) the trial court's injunction provisions are not unconstitutional, and (7) the trial court did not err in awarding attorney fees to the State under RCW 42.17A.780.

However, we also hold that (1) the trial court erred in ruling that Eyman violated the FCPA by failing to report the $103,000 payment he received from Citizens in Charge, (2) the FCPA does not authorize the trial court's injunction provisions prohibiting Eyman from misleading potential donors and receiving payments from vendors, and (3) we cannot determine on this record whether the monetary penalty imposed on Eyman violated the excessive fines clauses in the United States and Washington constitutions in the absence of sufficient evidence regarding Eyman's ability to pay the penalty.

No. 56653-2-II

Accordingly, we affirm in part and reverse in part the trial court's final judgment, and remand for the trial court to (1) vacate the conclusion that Eyman violated the FCPA by failing to report the $103,000 payment he received from Citizens in Charge, (2) strike the injunction provisions prohibiting Eyman from misleading potential donors and receiving payments from vendors, and (3) consider Eyman's ability to pay the penalty imposed and to adjust the penalty if necessary to comply with the excessive fines clause.

FACTS

*Citizen Solutions Payment to Eyman*

In January 2012, Eyman filed with the Secretary of State an initiative to the people that was labeled as I-1185. According to its official ballot title, I-1185 "would restate existing statutory requirements that legislative actions raising taxes must be approved by two-thirds legislative majorities or receive voter approval, and that new or increased fees require majority legislative approval." Clerk's Papers (CP) at 5. Eyman also formed a political committee called "Voters Want More Choices – Save the 2/3rds (Mike Fagan)" (VWMC) to advocate for I-1185. Eyman, Mike Fagan, and Jack Fagan were listed in the PDC filings as officers, and Stan Long was listed as treasurer.

In April 2012, VWMC entered into a contract with Citizen Solutions to obtain up to 300,000 signatures in support of I-1185 at a price of $3.50 per signature. Edward Agazarm, Roy Ruffino, and Edward's son William Agazarm were the principals of Citizen Solutions.

On May 15, William Agazarm emailed Eyman about raising the price from $3.50 to $4.00 for the remaining 200,000 signatures. Eyman agreed to the $0.50 increase for signature collection.

6

No. 56653-2-II

On June 5, Eyman emailed Ruffino and William Agazarm with a copy to Edward Agazarm about joining Citizen Solutions as a partner. Eyman stated that he was working hard to get an extra $270,000 for himself by getting it paid to Citizen Solutions. If they could not agree on a partnership, he proposed that the $270,000 be paid to his company, Tim Eyman, Watchdog for Taxpayers, LLC (Watchdog), as a sales commission.

On June 26, Edward Agazarm emailed Eyman regarding an additional increase in the per signature price. He stated that the "$270,000 outstanding on the signature contract has hampered our efforts and is tying our hands." Ex. 85. On June 27, William Agazarm emailed Eyman and urged him to increase the cost per signature price by $1.50. Eyman agreed. Eyman then sought additional contributions from donors.

Citizen Solutions made the final payment to its signature gathering contractors on July 3. On July 5, VWMC paid Citizen Solutions the final agreed amount remaining of $170,825. Eyman continued to solicit donations. Citizen Solutions received direct payments from the Washington Wine and Beer Wholesalers Association for $27,150 on July 5 and from the Association of Washington Businesses for $45,000 on July 6. The petitions with the required number of signatures were submitted to the Secretary of State on July 7.

On July 9, Eyman sent a letter to Citizen Solutions agreeing to perform consulting work for the next three years in exchange for payment to Watchdog of $300,000. On July 11, Citizen Solutions transferred $308,185.50 into Eyman's account.

VWMC reported to the PDC all payments to Citizen Solutions for signature gathering, and also reported in-kind contributions from various business groups that paid Citizen Solutions directly. Neither VWMC nor Eyman reported to the PDC the $308,185 payment from Citizen Solutions to Eyman.

7

No. 56653-2-II

*Eyman Loan to Citizens in Charge*

In April 2012, Eyman filed with the Secretary of State an initiative to the people that was labeled as I-517. According to its official ballot title, I-517 "would set penalties for interfering with or retaliating against signature-gatherers and petition-signers; require that all measures receiving sufficient signatures appear on the ballot; and extend time for gathering initiative petition signatures." CP at 5. Eyman also formed a political committee called "Protect Your Right to Vote on Initiatives" (PRVI) to advocate on behalf of I-517. Again, Eyman, Mike Fagan, and Jack Fagan were listed in the PDC filings as officers, and Stan Long was listed as treasurer.

Beginning in July 2012, Watchdog loaned a total of $200,000 in four installments to Paul Jacob at Citizens in Charge to fund the I-517 campaign. The loan was to help get I-517 on the 2013 ballot. Eyman then reached out to potential donors, asking them to make anonymous, tax deductible donations to Citizens in Charge to support I-517.

Citizens in Charge ultimately paid for signature gathering for I-517 in the aggregate amount of $182,806. PRVI reported this payment as an in-kind contribution. Eyman did not report to the PDC the loan he made to Citizens in Charge to help get I-517 on the ballot.

Citizens in Charge later made payments totaling $103,000 to Eyman. The payments were made in multiple installments between August 2013 and March 2018, and all but $15,000 was paid after February 2014. Eyman did not report to the PDC the payments he received from Citizens in Charge.

*Databar Refund*

Databar is a mail servicing company. Eyman used Databar's services in the past for ballot measure mailings and mailing gifts. In 2017, Databar owed VWMC a refund of $23,008. Instead of making the check payable to VWMC, Databar made the check payable to Watchdog

8

No. 56653-2-II

and Eyman kept the money. The Fagans authorized this payment at Eyman's request. But VWMC did not report the fact that the refund went to Eyman, although Eyman testified that he did not learn it was not reported until years later.

*Solicitation of Personal Donations*

From 2014 to 2016, Eyman solicited donations from various supporters to him personally.[1] Eyman did not request donations for any specific initiative campaign; he asked only for money to help him and his family. However, he indicated that the personal contributions would allow him to continue to work on initiative campaigns. For example, one solicitation stated that "as long as you continue to support me and my family, I will be able to take on these important battles." Ex. 124.

Eyman received a total of $837,502 in donations to him personally. Eyman did not report any of these donations to the PDC.

*FCPA Lawsuit, Discovery Issues, Partial Summary Judgment*

The PDC conducted an investigation of allegations against Eyman during the period from 2012 to 2015. The PDC referred the matter to the Attorney General's Office (AGO) for enforcement. In March 2017, the State filed a complaint alleging FCPA violations against Eyman individually and as an officer of VWMC, PRVI and Watchdog; William Agazarm; and Citizen Solutions. The State later filed an amended complaint to add allegations regarding Eyman's solicitations of personal donations.

In December 2017, the trial court granted the State's motion to compel discovery and ordered Eyman to provide answers and responses to the State's first set of discovery. In March

---

[1] Some of these solicitations encouraged supporters to make tax deductible donations in his name to Citizens in Charge, which had agreed to forward them to Eyman.

No. 56653-2-II

2018, the court found Eyman in contempt for failing to comply with the December 2017 order and imposed a $250 daily penalty until discovery responses were provided. In August 2019, the court increased the daily penalty to $500 when Eyman still failed to comply with discovery requests. The court found Eyman in contempt again for failing to respond to additional discovery requests.

On September 13, 2019, the trial court granted the State's motion for nonmonetary discovery sanctions against Eyman. In its order, the trial court stated that Eyman had willfully and deliberately violated the discovery rules and court orders, and the court found that the State's ability to prepare for trial had been prejudiced by Eyman's failure to provide discovery. The court stated that it had considered and imposed lesser sanctions, but those lesser sanctions had failed to induce Eyman to properly respond to discovery. Therefore, a greater sanction was warranted.

The trial court imposed as a discovery sanction under CR 37(b)(2)(A) that payments to Eyman totaling $766,447 "are hereby found to be 'contributions' in support of ballot propositions as defined by RCW 42.17A.005 and not gifts. That matter is established for the purposes of this action and requires no further proof by the State." CP at 1797.

The State then moved for partial summary judgment, arguing that Eyman violated the FCPA by failing to register as a political committee and failing to report $766,447 he had received that the trial court previously had deemed contributions in support of ballot propositions. The trial court granted the motion, concluding that Eyman (1) was a "continuing political committee" under RCW 42.17A.005, (2) had failed to register as a political committee, (3) had failed to report $766,447 in contributions that the court previously found were in support

10

No. 56653-2-II

of ballot propositions, (4) had failed to file monthly contribution and expenditure reports, and (5) had concealed $766,447 in contributions in violation of RCW 42.17A.435.

The trial court subsequently rejected several attempts by Eyman to vacate the nonmonetary sanction order and the partial summary judgment order. Eyman filed a petition for discretionary review with the Supreme Court regarding the trial court's denial of his motion to vacate both orders. The Supreme Court Commissioner denied the petition.

*Trial Court Ruling*

Following a nine day trial, the trial court found that Eyman violated the FCPA and issued lengthy findings of fact and conclusions of law and an injunction.

The court entered the following conclusions of law regarding FCPA violations:

> 3.1  As an officer of VWMC, the proponent of I-1185, Defendant Eyman violated the FCPA twice by having the committee make two separate payments to Citizen Solutions, LLC and reporting that the purpose of the payments was to pay for signature gathering, when in fact they were to compensate Defendant Eyman. Each instance of concealment, and each violation carries a maximum penalty of $10,000 for a total of **$20,000**.

CP at 4962.

> 3.2  Eyman accepted a payment from Citizen Solutions, LLC totaling $308,185.50. That payment was comprised of political contributions paid to Citizen Solutions, LLC, and were given to Defendant Eyman for his personal use. Defendant Eyman failed to report and actively concealed the true purpose of the payment, which was his personal use of those funds, in violation of RCW 42.1A.235, .240, .435, and .445.  The law permits a penalty equal to that amount under RCW 42.17A.750(1)(g), for a total of **$308,185.50**, in addition to the penalties above.

CP at 4962.

> 3.3  On four occasions, Defendant Eyman made concealed contributions to the I-517 campaign by making those payments to Citizens in Charge with the intent that they be spent on I-517 signature gathering without revealing the source of the funds. Each of those instances constituted concealment, which is a violation of the FCPA, and each violation carries a maximum penalty of $10,000, for a total of **$40,000**, in addition to the penalties above.  RCW 42.17A.750(1)(c).

11

No. 56653-2-II

CP at 4962.

> 3.4 The four contributions to the I-517 campaign made by Defendant Eyman were concealed in violation of RCW 42.17A.235, .240, and .435. The amount of those contributions actually expended on the I-517 campaign, which was not reported as required and was actively concealed, totaled $182, 806. The law permits a possible penalty equal to that amount under RCW 42.17A.750(1)(g), for a total of **$182,806**, in addition to the penalties above.

CP at 4963.

> 3.5 Defendant Eyman received $103,000 in loan repayments from Citizens in Charge, which were given to Citizens in Charge Foundation as contributions to the I-517 campaign and then transferred to Citizens in Charge before being paid to Defendant Eyman. The sources of the contributions that funded the $103,000 in payments were not reported as required and were actively concealed in violation of RCW 42.17A.235, .240, .435. The law permits a possible penalty equal to that amount under RCW 42.17A.740(1)(g), for a total of **$103,000**, in addition to the penalties above.

CP at 4963.

> 3.6 Defendant Eyman is a continuing political committee, as that term is defined under RCW 42.17A.005. The law permits a maximum penalty for his failure to register as a political committee of **$10,000** in addition to the penalties above. RCW 42.17A.750(1)(c).

CP at 4963.

> 3.7 As of the first day of trial, November 16, 2020, Defendant Eyman's registration as a political committee is 2,975 days late. The law permits a penalty of $10 per day his registration is late, for a total possible penalty of **$29,750**, in addition to the penalties above. RCW 42.17A.750(1)(e).

CP at 4963.

> 3.8 Defendant Eyman received reportable contributions in support of ballot propositions in 58 months. For each month Defendant Eyman concealed contributions to himself in support of ballot propositions the law permits a maximum penalty of $10,000, for a total penalty of **$580,000** in addition to the penalties above. RCW 42.17A.750(1)(c).

CP at 4963.

> 3.9 The concealed contributions received by Defendant Eyman and expended for his personal use totaled $837,502, which includes the $766,447 this court

12

No. 56653-2-II

> previously found as a discovery sanction and an additional $71,005 this court found as a matter of fact at trial. All of these funds were received to further his work on and in support of ballot propositions. The amounts and sources of these contributions were not reported as required and were actively concealed in violation of RCW 42.17A.253, .240, and .435. The law permits a penalty equal to the amount concealed under RCW 42.17A.750(1)(g), for a total possible penalty of **$837,502** in addition to the penalties above.

CP at 4964.

> 3.10 Defendant Eyman misappropriated $23,008.93 from his own committee VWMC in the form of a refund a campaign vendor, Databar, Inc. owed to VWMC, which was paid to Defendant Eyman instead of VWMC. That refund was for funds paid to Databar, Inc. by VWMC out of political contributions. Instead of returning those funds to VWMC, they were paid to Defendant Eyman for his personal use. Defendant Eyman failed to report these funds as required and actively concealed his personal use of them in violation of RCW 42.17A.235, .240, .435, and .445. The law permits a penalty equal to that amount under RCW 42.17A.750(1)(g), for a total of **$23,008.93**, in addition to the penalties above.

CP at 4964.

> 3.11 Defendant Eyman was required to file monthly C-3 and C-4 reports for contributions he personally received. He failed to file 124 reports. For each of these unfiled reports the law permits a maximum penalty of $10,000, for a total possible penalty of **$1,240,000,** in addition to the penalties above.

CP at 4964.

> 3.12 As of the first day of trial, November 6, 2020, Defendant Eyman's combined unfiled reports were a combined 212,491 days late. The law permits a penalty of $10 per day his reports were late, for a total possible penalty of **$2,124,910** in addition to the penalties above. RCW 42.17A.750(1)(e).

CP at 4964-65.

The trial court concluded that the "total potential base penalty in this matter, as listed above, is at least **$5,754,987.43**." CP at 4965. And given Eyman's history and experience with the FCPA, and his past violations, the court found that "this matter warrants the maximum penalty against Defendant Eyman for each of the violations described above, though the maximum penalty is not assessed here." CP at 4967.

13

No. 56653-2-II

The court concluded,

> [I]t would be difficult for the Court to conceive of a case with misconduct that is more egregious or more extensive than the misconduct committed by Defendant Eyman in this matter. As a result of Defendant Eyman's numerous and blatant violations of the FCPA, the Court hereby assesses a penalty of $2,601,502.81 against Defendant Eyman individually.

CP at 4967 (cl 3.19).

The court declined to assess additional penalties:

> This Court has considered these additional penalties and has intentionally not included these additional penalties, though they are warranted here as described above. Because there have been so many violations the maximum penalty allowed by law could reach a number that is so large that it is excessive even under the most egregious of cases, which is this case, so the penalty amount has been reduced to the number indicated above.

CP at 4967. And the court declined to treble damages as allowed under RCW 42.17A.780.

The court also issued an injunction with a number of provisions, including that Eyman was enjoined from engaging in the following activities:

> 1. "[M]isleading contributors or potential donors directly or indirectly as to why they should donate to a political committee or how any contributions will be spent." CP at 4969.

> 2. "[R]eceiving payments from any person or vendor, directly or indirectly, who has provided or plans to provide paid services to a political committee with which Defendant Eyman is associated or of which he is a member." CP at 4969.

> 3. Failing to "report, in compliance with the FCPA, any gifts, donations, or any other funds Defendant Eyman receives directly or indirectly" with certain exceptions. CP at 4969.

> 4. "[M]anaging, controlling, negotiating, or directing financial transactions of any kind for any Committee, as that term is defined by RCW 43.17A.005, in the future." CP at 4969-70.

In addition, the trial court required Eyman to comply with a number of other provisions, including:

> 9. Defendant Eyman shall not directly solicit contributions for himself or his family to support his political work without establishing a political committee, which must properly report the contributions to the PDC in compliance with FCPA. Any

14

No. 56653-2-II

> contributions must be made directly to the political committee, not directly to Defendant Eyman.

CP at 4970.

The trial court subsequently entered a judgment against Eyman for the $2,601,502.81 in civil penalties and $2,795,198.58 in attorney fees and $96,486.44 in costs incurred by the State. The judgment incorporated by reference the findings of fact, conclusions of law, and injunction. Eyman filed a motion for reconsideration, which was denied.

Eyman appealed, seeking direct review with the Supreme Court and a stay of the injunction. The Supreme Court Commissioner denied direct review and denied the stay, and transferred the case to this court.

## ANALYSIS

### A.   PROCEDURAL ISSUES

#### 1.   Timeliness of Appeal

The State argues that Eyman's appeal is untimely because he did not appeal the trial court's findings of fact and conclusions of law within 30 days after they were entered. We disagree.

The trial court entered its findings of fact, conclusions of law, and injunction on February 10, 2021. The State subsequently filed a motion for attorney fees. On April 16, the trial court entered judgment against Eyman for the amount of the civil penalty, attorney fees, and costs. The judgment incorporated by reference the findings of fact, conclusions of law, and injunction. Eyman filed a motion for reconsideration on April 26. The trial court denied this motion on June 15. Eyman appealed to the Supreme Court on July 15.

A "final judgment" is appealable as a matter of right. RAP 2.2(a)(1). Under RAP 5.2(a), a notice of appeal generally must be filed within 30 days after entry of the trial court's decision

15

that the appellant wants reviewed. However, the appeal deadline is extended until 30 days after an order denying a timely motion for reconsideration. RAP 5.2(e). Eyman's appeal was filed 30 days after the trial court denied his motion for reconsideration.

The State argues that Eyman was required to file a notice of appeal within 30 days of the trial court's entry of the findings of fact, conclusions of law, and injunction. The State cites to *Denny v. City of Richland*, which held that a summary judgment order is a final, appealable judgment that must be appealed within 30 days regardless of a subsequent attorney fee award. 195 Wn.2d 649, 659, 462 P.3d 842 (2020). The State suggests that the trial court's April 16 judgment did nothing more than award attorney fees, which under *Denny* did not extend the appeal deadline.

But unlike in *Denny*, the trial court's February 2021 findings of fact, conclusions of law, and injunction was not a final judgment. The final judgment, which incorporated the findings of fact, conclusions of law and injunction, was entered on April 16. We hold that Eyman's appeal was timely.

2. Standing to File Suit

Eyman argues for the first time in his reply brief that the State does not have standing under the FCPA to address transactions between individual private citizens or financial arrangements between private persons and election vendors. But we generally do not consider arguments raised for the first time in a reply brief. RAP 10.3(c); *Ainsworth v. Progressive Cas. Ins. Co.,* 180 Wn. App. 52, 78 n.20, 322 P.3d 6 (2014) ("To address issues argued for the first time in a reply brief is unfair to the respondent and inconsistent with the rules on appeal.") Therefore, we decline to consider this argument.

16

No. 56653-2-II

  3. Statute of Limitations

Eyman makes a reference to the statute of limitations, which for the FCPA is five years. RCW 42.17A.770. This reference apparently relates to the fact that some of the trial court's findings of fact refer to events that occurred before March 2012, five years before the State filed suit. But none of the FCPA violations that the trial court found involved activities that occurred before March 2012. And the statute of limitations does not preclude a fact finder from considering evidence outside the limitations period in determining whether violations occurred within the limitation period. *See Broyles v. Thurston County*, 147 Wn. App. 409, 434-35, 195 P.3d 985 (2008).

B.  FAIR CAMPAIGN PRACTICES ACT

  1. FCPA Policies

Two primary policies underlying the FCPA are "[t]hat political campaign and lobbying contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided" and "[t]hat the public's right to know of the financing of political campaigns . . . far outweighs any right that these matters remain secret and private." RCW 42.17A.001(1), (10).[2]

  To that end, the FCPA provides reporting and disclosure requirements for political committees to report to the PDC all contributions received and expenditures made. RCW 42.17A.235(1)(a); RCW 42.17A.240(2), (7). "The FCPA is an attempt to make elections and politics as fair and transparent as possible; and to accomplish that goal, the act requires

---

[2] Multiple provisions of chapter 42.17A RCW have been amended since the events of this case transpired. Some of these amendments did not impact the statutory language on which we rely, and we refer to the current statutes. When the amendments are more significant, we refer to the former statutes.

17

No. 56653-2-II

candidates, political committees, and lobbyists to disclose their campaign contributions and

spending." *State v. Grocery Mfrs. Ass'n*, 198 Wn.2d 888, 892, 502 P.3d 806 (2022) (*GMA* II).

2. Statutory Requirements

Under former RCW 42.17A.005(37) (2011), a "political committee" means "any person

. . . having the expectation of receiving contributions or making expenditures in support of, or

opposition to, any candidate or any ballot proposition." The term "person" includes an

individual. Former RCW 42.17A.005(35). A political committee must file a statement of

organization with the PDC. RCW 42.17A.205(1). A political committee also must file reports

with the PDC at various intervals that contain certain specified information. RCW 42.17A.235,

.240. This information includes the name of each person contributing funds to the committee

and the amount of the contribution and all expenditures. RCW 42.17A.240(2), (7).

The FCPA also prohibits concealing the source of contributions:

> No contribution shall be made and no expenditure shall be incurred, directly or
> indirectly, in a fictitious name, anonymously, or by one person through an agent,
> relative, or other person in such a manner as to conceal the identity of the source of
> the contribution or in any other manner so as to effect concealment.

RCW 42.17A.435. The FCPA broadly defines contribution to include loans, donations, and

payments. Former RCW 42.17A.005(13)(a)(i).

Under RCW 42.17A.445, contributions to a political committee can be paid to an

individual or expended for the individual's personal use only to reimburse lost earnings,

reimburse campaign expenses incurred, and repay loans.

3. Penalties

RCW 42.17A.750 outlines a number of maximum penalties for various FCPA violations.

A person who violates any provision in chapter 42.17A RCW may be subject to a civil penalty of

not more than $10,000 for each violation. RCW 42.17A.750(1)(c). A person who fails to timely

No. 56653-2-II

file a required statement or report may be subject to a civil penalty of $10 per day while the delinquency continues. RCW 42.17A.750(1)(e). A person who fails to report a contribution or expenditure as required may be subject to a civil penalty equivalent to the amount not reported. RCW 42.17A.750(1)(g). The trial court also may treble the amount of the judgment as punitive damages if the violation is intentional. RCW 42.17A.780.

In addition, the trial court "may enjoin any person to prevent the doing of any act herein prohibited, or to compel the performance of any act required herein." RCW 42.17A.750(1)(i).

4.    Liberal Construction

RCW 42.17A.001[3] states that "the provisions of the [FCPA] shall be liberally construed to promote complete disclosure of all information respecting the financing of political campaigns and lobbying." Eyman argues that despite the statute's mandate, the FCPA is a criminal statute that must be strictly construed against the State. But this case involves the imposition of civil penalties under RCW 42.17A.750, not criminal charges.

The Supreme Court repeatedly has quoted the requirement in RCW 42.17A.001 that the FCPA be liberally construed. *E.g., State v. Grocery Mfrs. Ass'n*, 195 Wn.2d 442, 454, 461 P.3d 334 (2020) (*GMA* I); *Utter v. Bldg. Indus. Ass'n of Wash.*, 182 Wn.2d 398, 406, 341 P.3d 953 (2015). And the Supreme Court has relied on that directive in interpreting FCPA provisions. *State v. Evergreen Freedom Found.*, 192 Wn.2d 782, 796, 432 P.3d 805 (2019). Therefore, we must liberally construe rather than strictly construe the FCPA.

C.    STANDARD OF REVIEW

When reviewing a trial court's ruling following a bench trial, we determine whether substantial evidence supports the court's findings of fact and whether the findings support the

---

[3] The liberal construction provision is an unnumbered paragraph following subsection (11).

19

conclusions of law. *Real Carriage Door Co. ex rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955, *review denied*, 198 Wn.2d 1025 (2021). Substantial evidence supports a finding if it is sufficient to persuade a rational, fair-minded person that the finding is true. *Id.* We view the evidence in the light most favorable to the prevailing party, including all reasonable inferences. *Id.* And we do not review the court's assessment of the credibility of witnesses. *Id.*

We treat unchallenged findings of fact as verities on appeal. *Id.* Although Eyman assigns error to all of the trial court's findings of fact, his briefs present no argument regarding findings 2.1-2.17, 2.29, and 2.31-2.32. Therefore, these findings are verities on appeal. In addition, Eyman challenges only portions of many of the findings. The portions that are not challenged are treated as verities.

We review the trial court's conclusions of law de novo. *Conway Constr. Co. v. City of Puyallup*, 197 Wn.2d 825, 830, 490 P.3d 221 (2021). If conclusions of law are mischaracterized as findings of fact, we analyze them as conclusions of law based on a de novo standard. *Casterline v. Roberts*, 168 Wn. App. 376, 381, 284 P.3d 743 (2012).

D. PAYMENT FROM CITIZEN SOLUTIONS TO EYMAN

Eyman argues that the trial court erred in ruling that he violated the FCPA by having VWMC report that certain payments to Citizen Solutions were for the purpose of signature gathering rather than for paying Eyman $308,185.50. We disagree.

1. Violations Found by Trial Court

The trial court concluded that Eyman violated the FCPA by

(1) "having the committee make two separate payments to Citizen Solutions, LLC and reporting that the purpose of the payments was to pay for signature gathering, when in fact they were to compensate Defendant Eyman," which constituted concealment, CP at 4962; and

20

(2) "accept[ing] a payment from Citizen Solutions, LLC totaling $308,185.50. That payment was comprised of political contributions paid to Citizen Solutions, LLC, and were given to Defendant Eyman for his personal use. Defendant Eyman failed to report and actively concealed the true purpose of the payment, which was his personal use of those funds, in violation of RCW 42.17A.235, .240, .345, and .445," CP at 4962.

2.    Challenged Findings of Fact

Eyman challenges 14 of the trial court's findings of fact regarding the $308,185.50 payment he received from Citizen Solutions as not being supported by substantial evidence or as being conclusions of law.

After a careful review of the record, we conclude that substantial evidence supports findings 2.18, 2.20, 2.22-2.27, 2.30, and 2.33. We decline to consider the challenges to findings 2.19 and 2.28 because Eyman presents no meaningful argument regarding these findings. *See Billings v. Town of Steilacoom*, 2 Wn. App. 2d 1, 21, 408 P.3d 1123 (2017) (stating that we generally decline to consider an issue when the appellant has failed to provide meaningful argument). Finally, we conclude that findings 2.34 and 2.35, which state that Eyman violated the FCPA, constitute legal conclusions that we analyze de novo below.

Below in subsections (b)-(e) is a discussion of some of the factual findings most pertinent to the trial court's conclusion that Eyman violated the FCPA regarding the payment from Citizen Solutions.

a.    Opportunity to Object

Initially, Eyman argues that the trial court did not give him an opportunity to object to the findings of fact. CR 52(c) states, that "the court shall not sign findings of fact or conclusions of

21

No. 56653-2-II

law until the defeated party or parties have received 5 days' notice of the time and place of the submission, and have been served with copies of the proposed findings and conclusions."

Here, the State submitted the proposed findings on January 6, 2021, the day before the trial court heard closing arguments. At closing argument, the State also presented a template with the proposed language for the injunction. Eyman did not object at that time or after the trial was over to the proposed findings or the injunction. The court entered the finding of facts and conclusions of law on February 10. At no time after February 10 did Eyman object to or attempt to challenge the findings of fact or argue that he did not receive five days' notice. We reject Eyman's argument.

b.   Finding 2.18

The trial court found in finding 2.18 that Eyman agreed to increase Citizen Solutions' price per signature by $0.50 and then by $1.50 "[i]n furtherance of the conspiracy to fund a kickback to himself." CP at 4947. Eyman argues that the finding that there was a "conspiracy to fund a kickback to himself" is a legal conclusion and that the court made conclusory inferences from factual assertions.

But why Eyman agreed to the price increases and the purpose for the increases involves a factual determination, not a legal one. And although there may not have been any direct evidence of this kickback conspiracy, as Eyman acknowledges, the court made that inference based on the evidence. On review, we view all inferences from the evidence in the light most favorable to the State. *Real Carriage Door*, 17 Wn. App. 2d at 457. We conclude that substantial evidence supports finding 2.18.

22

No. 56653-2-II

c.    Findings 2.22 and 2.23

The trial court found in finding 2.22 that Eyman attempted to convince contributors to provide donations to fund the $170,000 that VWMC has paid to Citizen Solutions, knowing that Citizen Solutions already had agreed to return the $170,000 and more to Eyman as a kickback. The trial court found in finding 2.23 that "Eyman was engaged in a scheme with Defendant Citizen Solutions . . . to generate a kickback to himself from the political contributions he was soliciting."  CP at 4949.

Eyman again argues that the finding that he received a kickback is a legal conclusion and is not supported by substantial evidence.  But as discussed above, this finding involves a factual determination and is supported by a reasonable inference from the evidence when viewed in the light most favorable to the State.  We reject the challenge to finding 2.22 and finding 2.23.

d.    Finding 2.25

The trial court found in finding 2.25 that "Eyman's statements in the June 5, 2012, email showed his awareness that funds being paid to Defendant Citizen Solutions would not be used exclusively to fund signature gathering for I-1185, as was being reported by his committee VWMC, but would be converted to Defendant Eyman's personal use."  CP at 4949-50.  Eyman argues that substantial evidence does not support the finding that he understood the funds paid to Citizen Solutions would not be exclusively used for signature gathering.

In the June 5 email, Eyman stated that he was working hard to get an extra $270,000 for himself by getting it paid to Citizen Solutions.  He proposed that the $270,000 be paid to Watchdog as a sales commission.  Watchdog later was paid $308,185.50.  The trial court could infer from this evidence that Eyman knew that some of the money paid to Citizen Solutions would be paid to Eyman.  On review, we view all inferences from the evidence in the light most

23

No. 56653-2-II

favorable to the State. *Real Carriage Door*, 17 Wn. App. 2d at 457. We conclude that

substantial evidence supports finding 2.25.

      e.    Finding 2.30

The trial court found in finding 2.30 that Citizen Solutions' $308,185.50 payment to

Eyman was a kickback made "with the specific intent to violate the FCPA by concealing from

the public the purpose of five expenditures of donor funds to Citizen Solutions, LLC, which were

contributed to support I-1185, and to conceal from the public Defendant Eyman's personal use of

$308,185.50 in political contributions." CP at 4952. Eyman argues that this finding states a

legal conclusion and is not supported by substantial evidence.

The trial court could infer from the evidence that Eyman intended to violate the FCPA

and to conceal his personal use of political contributions. On review, we view all inferences

from the evidence in the light most favorable to the State. *Real Carriage Door*, 17 Wn. App. 2d

at 457. We conclude that substantial evidence supports finding 2.30.

    3.    FCPA Analysis

The trial court's findings of fact, supported by substantial evidence, establish that Citizen

Solutions paid Eyman $308,185.50 as a kickback from direct payments Citizen Solutions

received from VWMC and business associations. It is undisputed that VWMC reported these

payments to Citizen Solutions as expenditures for signature gathering rather than as expenditures

to Eyman. The question is whether this conduct constitutes a violation of the FCPA by Eyman.

      a.    Improper Reporting of Expenditures by VWMC

The trial court concluded that Eyman violated the FCPA by having VWMC report that

the purpose of the expenditures was to pay for signature gathering when the true purpose was to

24

No. 56653-2-II

compensate Eyman, thereby violating reporting requirements, concealing the expenditure to Eyman and improperly paying Eyman with contributions.

The findings of fact discussed above support the conclusion that VWMC improperly reported the expenditures. The trial court found that Eyman knew that the later payments to Citizen Solutions were to fund a kickback to himself rather than to fund signature gathering. The general rule is that an agent's knowledge is imputed to the principal if the agent has "actual or apparent authority in connection with the subject matter 'either to receive it, to take action upon it, or to inform the principal or some other agent who has duties in regard to it.' " *Denaxas v. Sandstone Court of Bellevue, LLC*, 148 Wn.2d 654, 666, 63 P.3d 125 (2003) (quoting *Roderick Timber Co. v. Willapa Harbor Cedar Prods., Inc.*, 29 Wn. App. 311, 317, 627 P.2d 1352 (1981)); *see also Interlake Porsche & Audi, Inc. v. Bucholz*, 45 Wn. App. 502, 518, 728 P.2d 597 (1986) (holding that an officer's knowledge is imputed to the corporation). Here, Eyman was the agent and VWMC was the principal.

RCW 42.17A.235(1)(a) requires political committees to report all expenditures, and RCW 42.17A.240(7) requires a political committee to report the purpose of each expenditure. VWMC's report of the expenditures to Citizen Solutions, which Citizen Solutions then paid to Eyman as being for the purpose of signature gathering, was improper because of its imputed knowledge that the expenditures actually were for the purpose of compensating Eyman. We conclude that the trial court's findings support the conclusion that *VWMC* violated RCW 42.17A.235(1)(a) and .240(7).

RCW 42.17A.435 states that "no expenditure shall be incurred" by one person through another person "in such a manner as to conceal the identity of the source of the contribution." Here, the trial court found that VWMC essentially paid Eyman $308,185.50 through another

25

No. 56653-2-II

person – Citizen Solutions. In other words, rather than paying that amount directly to Eyman, VWMC concealed the source of the payment by making the payment to Citizen Solutions and then having Citizen Solutions pay Eyman. Again, Eyman's knowledge of the scheme is imputed to VWMC. We conclude that the trial court's findings support the conclusion that *VWMC* violated RCW 42.17A.435.

RCW 42.17A.445 states that a political committee can make payments to individuals only to reimburse an individual for lost earnings or out-of-pocket expenses or to repay loans. Eyman did not establish or even argue that he was entitled to the $308,185.50 under RCW 42.17A.445. Therefore, we conclude that the trial court's findings support the conclusion that *VWMC* violated RCW 42.17A.435.

### b. Eyman's Responsibility for VWMC's Violations

As discussed above, we conclude that the trial court's findings support the conclusion that VWMC committed FCPA violations with regard to Citizen Solutions' $308,185.50 payment to Eyman. But the trial court concluded that *Eyman*, not VWMC, violated the FCPA by improperly reporting, concealing, and improperly making the payment. Therefore, we must determine whether a political committee's officer can be held responsible for FCPA violations based on the *committee's* FCPA violations. The trial court did not explain why Eyman could be held personally responsible. And neither Eyman nor the State expressly address this issue.

Initially, Eyman had no obligation *as an individual* to report the Citizen Solutions payment. There is no indication that the trial court found that Eyman was a political committee at that time, so the payment was not a "contribution" that he had to report under RCW 42.17A.235(1)(a). Nothing in the FCPA requires an individual (other than a candidate) to report payments received from a political committee. In addition, RCW 42.17A.435 relates only to the

26

No. 56653-2-II

concealment of making contributions or expenditures, not concealment of receiving payments from a political committee. Eyman's receipt of the $308,185.50 did not involve the making of a contribution or an expenditure by him.

Eyman raises this issue by arguing that only the political committee's treasurer has reporting responsibilities under the FCPA. We treat this as an argument that an officer of a political committee cannot be held responsible for the committee's FCPA violations.

Eyman's claim that only a political committee's treasurer has a reporting obligation is incorrect. RCW 42.17A.235(1)(a) states that "each candidate or *political committee* must file with the commission a report of all contributions received and expenditures made as a political committee on the next reporting date pursuant to the timeline established in this section." (Emphasis added). In other words, the political committee has the obligation to file the required reports.

However, Eyman is correct that a political committee must appoint a treasurer, RCW 42.17A.210(1), and the FCPA identifies the treasurer as the person responsible for certifying and filing the political committee's reports. RCW 42.17A.225(6) (stating that the treasurer shall certify all reports as correct); RCW 42.17A.235(2) and (6) (stating that each political committee's treasurer must file the reports containing the information required under RCW 42.17A.240 at certain intervals and that the treasurer must maintain books reflecting all contributions and expenditures); RCW 42.17A.240 (stating that the information required to be disclosed under that statute must be certified by the treasurer). And no FCPA provisions state that an officer of the political committee is responsible for filing reports.

Nothing in the FCPA expressly provides that the trial court has authority to hold a political committee officer responsible for a committee's reporting violation, concealment, or

27

No. 56653-2-II

improper payment. And no case holds that a trial court has such authority. However, RCW 42.17A.750(1)(c), (e) and (g) state that "a person" – not only a candidate or a political committee – who violates the FCPA is subject to civil penalties. The term "person" includes an individual. Former RCW 42.17A.005(35). Therefore, RCW 42.17A.750(1) can be liberally construed as providing authority to hold a political committee officer responsible for the committee's FCPA violations.

Here, Eyman was the person who orchestrated this entire scheme. The trial court's findings establish that he knew that the later payments VWMC was making to Citizen Solutions were for the purpose of compensating him rather than for gathering signatures. Therefore, he knew that (1) VWMC's reporting of expenditures was incorrect in violation of RCW 42.17A.235(1)(a) and .240(7), (2) VWMC was concealing the expenditure to himself by making payments to Citizen Solutions in violation of RCW 42.17A.435, and (3) VWMC was making an improper payment to an individual in violation of RCW 42.17A.445. Further, Eyman was listed in VWMC's registration papers as one of the persons authorized to make decisions for the committee. In other words, Eyman – not VWMC – was the actual person who was violating the FCPA.

The legislature has directed courts to liberally construe FCPA provisions. RCW 42.17A.001. In light of this directive and under the specific, unique facts of this case, we hold that Eyman can be charged with VWMC's violations of the FCPA with regard to the $308,185.50 payment.

Accordingly, we affirm the trial court's conclusion that Eyman violated the FCPA with regard to the $308,185.50 payment from Citizen Solutions to him, resulting in maximum

28

No. 56653-2-II

penalties of $20,000 for two improper reports and $308,185.50 for the amount Citizen Solutions paid to him.

E.     EYMAN'S "LOAN" TO CITIZENS IN CHARGE

Eyman argues that the trial court erred in ruling that he violated the FCPA by concealing a donation to the I-517 campaign through the $200,000 "loan" he made to Citizens in Charge and by failing to report the $103,000 payment he subsequently received from Citizens in Charge. We disagree regarding the loan but agree regarding the payment.

1.     Violations Found by Trial Court

The trial court concluded that Eyman violated the FCPA by

(1) "[making] concealed contributions to the I-517 campaign by making those payments to Citizens in Charge with the intent that they be spent on I-517 signature gathering without revealing the source of the funds," CP at 4962; and

(2) "receiv[ing] $103,000 in loan repayments from Citizens in Charge, which were given to Citizens in Charge Foundation as contributions to the I-517 campaign and then transferred to Citizens in Charge before being paid to Defendant Eyman. The sources of the contributions that funded the $103,000 in payments were not reported as required and were actively concealed," CP at 4963.

2.     Challenged Findings of Fact

Eyman challenges 10 findings of fact regarding his $200,000 loan to Citizens in Charge and the $103,000 payment from Citizens in Charge as not being supported by substantial evidence or as being conclusions of law.

After a careful review of the record, we conclude that substantial evidence supports findings 2.36-2.39, much of finding 2.40, the first sentence of 2.41, the second and third

29

sentences of finding 2.42, and finding 2.43. We conclude that substantial evidence does not support the finding in 2.40 that others did in fact make contributions to Citizens in Charge in support of I-517, and the second and third sentences of finding 2.41. We conclude that the last sentence of finding 2.40, the first sentence of finding 2.42, finding 2.44 and finding 2.45 constitute legal conclusions that we analyze de novo below.

However, we do not need to extensively analyze the findings regarding the $200,000 loan issue because the key facts are undisputed. Eyman does not challenge the findings in 2.39 and 2.42 that he made $200,000 in payments to Citizens in Charge or the finding in 2.44 that Citizens in Charge contributed $182,806 to the I-517 campaign. Instead, he argues that these transactions did not violate the FCPA.

The findings not supported by substantial evidence relate to the $103,000 payment. These findings are discussed in section 4 below.

3.  FCPA Analysis – Eyman Loan

The trial court's findings of fact, supported by substantial evidence, establish that Eyman paid $200,000 in four installments to Citizens in Charge to fund signature gathering for I-517, Citizens in Charge provided $182,806 for I-517 signature gathering, and Eyman did not report his payment to Citizens in Charge.

The trial court concluded that Eyman's payments to Citizens in Charge violated RCW 42.17A.235 and .240, which require that political committees report to the PDC all contributions received and expenditures made. But Eyman personally made these payments, and there is no indication that the trial court believed that Eyman qualified as a political committee at that time. Therefore, these two statutes did not require Eyman to report his payments to the PDC. We conclude that the trial court erred in ruling that Eyman violated RCW 42.17A.235 and .240.

30

No. 56653-2-II

However, the trial court also concluded that Eyman's payments to Citizens in Charge violated RCW 42.17A.435. That statute states that no "contribution" shall be made through another person "in such a manner as to conceal the identity of the source of the contribution." RCW 42.17A.435. The trial court's findings of fact establish that Eyman made contributions to the I-517 campaign through another person – Citizens in Charge – and thereby concealed the source of those contributions. And the findings show that the amount of these concealed contributions that were made to the I-517 campaign through Citizens in Charge was $182,806.

Accordingly, we affirm the trial court's conclusion that Eyman's $200,000 payment to Citizens in Charge violated RCW 42.17A.435, resulting in maximum penalties of $40,000 for the four payments and $182,806 for the amount contributed by Citizens in Charge.

4. FCPA Analysis – Payment to Eyman

The trial court's conclusion that Eyman was required to report the $103,000 payment from Citizens in Charge to him was based on the trial court's findings (1) in finding 2.40, that others in fact made contributions to support 1-517 through Citizens in Charge; and (2) in finding 2.41, that contributions to Citizens in Charge to support I-517 funded the payment.

The trial court found in finding 2.40 that "Eyman encouraged others to make contributions to support I-517, specifically promising anonymity, and *they in fact did make concealed contributions to support I-517* by laundering their contributions through Citizens in Charge Foundation." CP at 4955 (emphasis added). The court then referenced two emails in which Eyman solicited contributions to Citizens in Charge.

However, although Eyman clearly solicited donations to Citizens in Charge, the State points to no evidence that people actually made donations to Citizens in Charge to support I-517. The State cites to exhibits 106, 164 and 166, but none of these exhibits show payments from

No. 56653-2-II

donors to Citizens in Charge in support of I-517. Therefore, we conclude that substantial

evidence does not support that finding.

Finding 2.41 states,

Evidence at trial demonstrated that from August 2013 through October 2018, Defendant Eyman received $103,000 in payments from Citizens in Charge. Though he steered the sources of those funds to Citizens in Charge, Defendant Eyman failed to disclose the true sources of the payments as contributions to the I-517 campaign. This Court finds that the payments made to Citizens in Charge and its foundation to repay Defendant Eyman's loan were in fact contributions to support the I-517 campaign.

CP at 4955.

However, the State points to no evidence that the money Citizens in Charge paid to

Eyman came from I-517 donations. As discussed above, there is no evidence that donors

actually made contributions to Citizens in Charge to support I-517. In addition, a large majority

of the payments were made from 2014 through 2018, long after I-517 was on the ballot in

November 2013. Eyman received only $15,000 in 2013. Therefore, we conclude that substantial

evidence does not support finding 2.41.

Substantial evidence does not support the factual findings supporting the trial court's

legal conclusion that the failure to report the $103,000 payment violated the FCPA.

Accordingly, we conclude that the trial court erred in ruling that Eyman violated the FCPA by

not reporting the $103,000 payment from Citizens in Charge and that Eyman was subject to a

maximum penalty of $103,000 relating to that payment.[4]

---

[4] Reversing on this issue does not require us to remand for the trial court to reconsider the penalty imposed because the maximum penalty was $5,754.987.43, and the penalty actually imposed was only $2,601,502.81. There is no indication that removing $103,000 from the maximum penalty would impact the trial court's penalty determination.

32

No. 56653-2-II

F.     DATABAR REFUND PAID TO EYMAN

Eyman argues that the trial court erred in ruling that he violated the FCPA by failing to

report to the PDC the $23,008.93 refund he received from Databar.  We disagree.

1.     Violation Found by the Trial Court

The trial court concluded that Eyman violated the FCPA by (1) having a refund Databar

owed to VWMC, which was for funds paid to VWMC out of political contributions, paid to

himself for his personal use; and (2) failing to report these funds as required and concealing his

personal use of them in violation of RCW 42.17A.235, 240, .435, and .445.

2.     Challenged Finding of Fact

Finding 2.60 states in part,

> Defendant Eyman testified that mailing service company Databar, Inc. owed a
> $23,008.93 refund to Voters Want More Choices ("VWMC") in 2017.  Rather than
> directing the refund of that amount from the vendor to his political committee, he
> testified that he asked for the funds to be paid directly to his own company,
> Defendant Watchdog.  He then transferred the money out of Watchdog's account
> and into his own account.  The expenditure of these funds to Defendant Eyman was
> not reported to the PDC as required.  Defendant Eyman admitted at trial that he
> made personal use of these funds that belonged to his political committee.

CP at 4960.

Eyman argues that this finding is not supported by substantial evidence.  He claims that

this amount was paid to him by the committee for amounts owed to him, and that he tried to

report the payment but PDC rejected his report.[5]  However, the finding states facts that Eyman

does not dispute – that the refund from Databar was paid to him for his personal use and the

payment was not reported to PDC.  The fact that Eyman may have provided an explanation for

---

[5] Eyman also argues that this issue was not properly before the court because the State did not
assert this violation in its amended complaint.  But the trial court ruled that the State's amended
complaint was broad enough to include this issue.  Eyman did not assign error to that ruling.

No. 56653-2-II

the failure to report does not affect the validity of this finding. We conclude that substantial evidence supports the portion of finding 2.60 quoted above.

3. FCPA Analysis

VWMC had a duty under RCW 42.17A.235(1) and .240(7) to report all expenditures. The refund that went to Eyman rather than to VWMC constituted an expenditure, but VWMC did not report this payment. Eyman claims that he tried to have VWMC's treasurers report the payment and tried to report it himself. But the fact that Eyman may have had an explanation for why the expenditure was not reported does not mean that there was no statutory violation. And as an officer, he had the authority to direct VWMC to make this report. We conclude that the trial court's finding supports the conclusion that *VWMC* violated RCW 42.17A.235(1) and .240(7).

The trial court also concluded that Eyman violated RCW 42.17A.435, which prohibits concealment of expenditures. Here, VWMC made an expenditure to Eyman indirectly through Databar in a manner that concealed the fact that the money actually was coming from VWMC. We conclude that the trial court's finding supports the conclusion that *VWMC* violated RCW 42.17A.435.

Finally, the court found a violation of RCW 42.17A.445, which states that a political committee can make payments to individuals only under certain circumstances. Eyman claims that the payment was to compensate him for amounts owed from the committee, but he provides no record cite for this claim. We conclude that the trial court's finding supports the conclusion that *VWMC* violated RCW 42.17A.445.

Again, neither the trial court nor the State explains why a political committee's officer can be personally charged with an FCPA violation when the committee fails to report or makes

34

No. 56653-2-II

an improper payment. But as discussed above, we conclude that under the specific facts of this case, Eyman can be held responsible for VWMC's FCPA violations because he directed this transaction and he – not VWMC – was the actual person who was violating the FCPA.

We hold that the trial court did not err in concluding that Eyman violated RCW 42.17A.235, 240, and .445 with regard to the Databar refund, resulting in a maximum penalty of $23,008.93.

G.      EYMAN'S RECEIPT OF PERSONAL CONTRIBUTIONS

Eyman argues that the trial court erred in ruling that he was a continuing political committee as defined in former RCW 42.17A.005(12) and therefore violated reporting duties under the FCPA. We conclude that Eyman fell within the definition of both "political committee" and "continuing political committee."

1.    Legal Principles

Former RCW 42.17A.005(37) defines "political committee" as "any person (except a candidate or an individual dealing with his or her own funds or property) having the expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or any ballot proposition." "Person" is defined broadly and includes "an individual" and "any other organization or group of persons, however organized." Former RCW 42.17A.005(35).

A person can either become a political committee in two ways: " '(1) expecting to receive or receiving contributions, or (2) expecting to make or making expenditures to further electoral political goals.' " *GMA* I, 195 Wn.2d at 455 (quoting *Utter*, 182 Wn.2d at 415). These are known as the contribution prong and the expenditure prong. *GMA* I, 195 Wn. 2d at 455.

"[T]he contribution prong does not apply any time an organization receives any funds that could potentially be spent in elections. It applies when an entity has 'the *expectation* of

35

receiving contributions' to be spent in elections. *Id.* at 457 (quoting former RCW 42.17A.005(40)). The expenditure prong applies only to entities that have a primary purpose of supporting or opposing candidates or ballot propositions. *GMA* I, 195 Wn. 2d at 455.

Former RCW 42.17A.005(12) defines "continuing political committee" as "a *political committee* that is an organization of continuing existence not established in anticipation of any particular election campaign." (Emphasis added.) No cases have addressed what constitutes a continuing political committee.

### 2. Discovery Sanction Order

The trial court's September 13, 2019 nonmonetary sanction order deemed that $766,447 in personal donations Eyman received were " 'contributions' in support of ballot propositions as defined by RCW 42.17.005." CP at 1797. If we affirm this order, we necessarily must conclude that Eyman was a political committee as defined in former RCW 42.17A.005(37).

Eyman argues that the trial court's discovery sanction order should be reversed because (1) deeming that the personal contributions he received were contributions in support of ballot propositions is a legal conclusion that is an inappropriate sanction under CR 37(b)(2)(A), and (2) the trial court erred in applying the factors stated in *Burnet v. Spokane Ambulance,* 131 Wn.2d 484, 933 P.2d 1036 (1997). We assume without deciding that the trial court erred in imposing the nonmonetary sanction under CR 37(b)(2)(A). Therefore, we will address the personal contribution issue on the merits.

### 3. Partial Summary Judgment Order

The trial court determined in its partial summary judgment order that Eyman was a continuing political committee. Eyman assigns error to this order, but only briefly addresses it.

No. 56653-2-II

In general, we will affirm a summary judgment order if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Mihalia v. Troth*, 21 Wn. App. 2d 227, 231, 505 P.3d 163 (2022); CR 56(c). Eyman does not suggest that there are material issues of fact regarding whether he is a continuing political committee. Instead, he argues that receiving donations to pay for his personal expenses does not make him a continuing political committee as a matter of law. This argument is discussed below.

4. Violations Found by Trial Court

The trial court concluded that Eyman was a continuing political committee as defined in RCW 42.17A.005. The court concluded that Eyman (1) failed to register as a political committee for 2,975 days, (2) did not report and concealed contributions to himself in support of ballot propositions for 58 months in the amount of $837,502, and (3) failed to file 124 monthly C-3 and C-4 reports for a combined 212,491 days.

5. Challenged Findings of Fact

Eyman challenges nine of the trial court's findings of fact regarding the court's determination that he was a continuing political committee as not being supported by substantial evidence or as being conclusions of law.

After a careful review of the record, we conclude that substantial evidence supports findings 2.46, 2.51, 2.53-2.55, 2.57, portions of 2.56, and 2.59. We conclude that portions of findings 2.56 and 2.58, which conclude that the personal donations Eyman received were contributions in support of ballot measures as defined by RCW 42.17A.005, constitute legal conclusions that we analyze de novo below.

However, we do not need to extensively analyze the findings regarding the personal contributions Eyman received because the keys facts are undisputed. Eyman does not challenge

37

No. 56653-2-II

the finding in 2.56 that the received over $835,000 in personal contributions. And he does not challenge the findings in 2.48 and 2.50 that he solicited the contributions to allow him to continue working on ballot initiatives.

A key challenged finding is finding 2.46, which states,

> From 2013-2018 Defendant Eyman continued to solicit and accept concealed payments from thousands of sources. The payments were *cast as compensation to Defendant Eyman for his work on initiative campaigns*, tax-deductible donations to Citizens in Charge earmarked for the benefit of Defendant Eyman and his family, and even as fraudulent charges for consulting work that Defendant Eyman did not perform. *He made all of these solicitations with the expectation of receiving funds to further his work on ballot propositions.*

CP at 4956-57 (emphasis added).

Eyman challenges the finding that he solicited and accepted donations as compensation for his work on initiative campaigns and to further that work. But substantial evidence supports this finding.[6] Eyman's solicitations touted his previous work on initiative campaigns and indicated that the personal donations were necessary for him to continue that work. For example, Eyman did not challenge finding 2.48, which quoted an email Eyman sent to dozens of supporters stating that "as long as you continue to support me and my family, I will be able to take on these important battles." CP at 4957. And Eyman does not challenge finding 2.50, which quoted an email Eyman sent to a supporter asking for a contribution for passing an initiative the previous year and for working on upcoming ballot initiatives.

6. Continuing Political Committee Analysis

Eyman argues that he cannot be characterized as a continuing political committee because (1) he is not a "political committee" because he did not receive contributions "in support

---

[6] However, we agree that the finding that he received "concealed payments" is a legal conclusion because the payments were not concealed if he had no duty to report.

38

of ballot propositions" as required under former RCW 42.17A.005(37), and (2) he is not a continuing political committee because he is not an "organization" as required under former RCW 42.17A.005(12). We disagree.

### a. Statutory Interpretation

As discussed above, whether the type of contributions Eyman received are "in support of ballot propositions" requires an interpretation of former RCW 42.17A.005(37), and statutory interpretation is a question of law. *Ekelmann v. City of Poulsbo*, 22 Wn. App. 2d 798, 807, 513 P.3d 840 (2022). We review de novo questions of statutory interpretation. *Id.*

Our goal in interpreting statutory language is to ascertain and give effect to the legislature's intent. *Id.* In making this determination, "[w]e consider the language of the statute, the context of the statute, related statutes, and the statutory scheme as a whole." *Id.* Undefined words in statutes must be given their plain and ordinary meaning. *Clark County v. Portland Vancouver Junction R.R., LLC*, 17 Wn. App. 2d 289, 295, 485 P.3d 985 (2021). We may refer to dictionary definitions to determine that plain meaning. *Id.*

A term is ambiguous if it is susceptible to two reasonable meanings. *Id.* "We resolve ambiguities by considering other indications of legislative intent, including principles of statutory construction, the legislative history of the statute, and relevant case law." *Id.* "Where two interpretations of statutory language are equally reasonable, our canons of construction direct us to adopt 'the interpretation which better advances the overall legislative purpose.' " *Wright v. Lyft, Inc.*, 189 Wn.2d 718, 729, 406 P.3d 1149 (2017) (quoting *Weyerhaeuser Co. v. Dep't of Ecology*, 86 Wn.2d 310, 321, 545 P.2d 5 (1976)).

No. 56653-2-II

Regarding interpretation of the FCPA, we also must adhere to the legislature's directive that FCPA provisions "shall be liberally construed to promote complete disclosure of all information respecting the financing of political campaigns." RCW 42.17A.001.

b.     Definition of Political Committee

Former RCW 42.17A.005(12) defines a "continuing political committee" as a "political committee" of continuing existence. Therefore, Eyman can be a continuing political committee only if he also is a political committee.

As noted above, former RCW 42.17A.005(37) defines "political committee" to include a person "having the expectation of receiving contributions . . . in support of . . . any ballot proposition." Eyman argues that he is not a political committee because he did receive contributions "in support of . . . any ballot proposition." Former RCW 42.17A.005(37). Instead, Eyman argues that he had the expectation of receiving contributions only to support him and his family. We disagree.

i.     Solicitation for Earlier Campaigns

The State initially argues that Eyman is a political committee because he solicited contributions in support of I-1185 and I-517. But Eyman solicited contributions to the campaign committees, not to himself. The FCPA cannot be interpreted as requiring every person who solicits contributions to a campaign committee to register as a political committee. The issue here is whether Eyman's receipt of personal contributions *to himself* makes him a political committee.

ii.     Direct vs. Indirect Support

Eyman's argument essentially is that a political committee is formed only if there is an expectation of receiving contributions that will be used to provide *direct* support to a ballot

40

proposition. He asserts that to be a political committee, a person must actually use the contributions to support a ballot proposition. Examples of direct support would be paying for signature gathering or campaign advertising. He refers to the statement in *GMA* I that an entity constitutes a political committee if it expects to receive contributions "to be spent in elections." 195 Wn. 2d at 457.

The State argues that the definition of political committee includes the expectation of receiving contributions that will provide *indirect* support to ballot propositions. Such support would include paying for Eyman's living expenses so he can continue working full time on ballot propositions.

No case has addressed whether the "support" referenced in former RCW 42.17A.005(37) includes indirect support. The statement in *GMA* I that Eyman references is not directly applicable because the court was addressing organizations funded with contributions that exist for purposes other than pursuing electoral goals. 195 Wn.2d at 457. The court noted that the fact that such organizations potentially could spend donated funds in elections does not make them political committees. *Id.*

The interpretation that the term "support" in former RCW 42.17A.005(37) is limited to direct support and the interpretation that the term includes the type of indirect support at issue here both are reasonable. Therefore, we conclude that the term "support" is ambiguous. This means that we must consider the legislative intent, *Portland Vancouver Junction R.R.*, 17 Wn. App. 2d at 295, and determine which interpretation better advances the legislature's purpose in enacting the FCPA, *Wright*, 189 Wn.2d at 729.

As noted above, two primary policies underlying the FCPA are "[t]hat political campaign and lobbying contributions and expenditures be fully disclosed to the public and that secrecy is

41

No. 56653-2-II

to be avoided" and "[t]hat the public's right to know of the financing of political campaigns . . . far outweighs any right that these matters remain secret and private." RCW 42.17A.001(1), (10). The purpose of the FCPA is " 'to ferret out . . . those whose purpose is to influence the political process and subject them to the reporting and disclosure requirements of the act in the interest of public information.' " *Voters Educ. Comm. v. Pub. Disclosure Comm'n*, 161 Wn.2d 470, 480, 166 P.3d 1174 (2007) (alteration in original) (quoting *State v. (1972) Dan J. Evans Campaign Comm.*, 86 Wn.2d 503, 508, 546 P.2d 75 (1976)). "The FCPA is an attempt to make elections and politics as fair and transparent as possible." *GMA* II, 198 Wn.2d at 892.

Providing a broader definition of "support," and therefore of "political committee," is consistent with legislative intent and better advances the legislature's purpose in enacting the FCPA. In addition, we must liberally construe FCPA provisions. RCW 42.17A.001. This liberal construction also would support a broader definition of "support" and "political committee." Therefore, we conclude that the definition of "political committee" includes a person who expects to receive contributions that will indirectly support any ballot proposition.

Here, it is undisputed – and the trial court so found – that Eyman solicited and received contributions to pay his living expenses so he could continue working on ballot propositions. These contributions provided indirect support to the ballot propositions on which Eyman worked. Therefore, we hold that Eyman met the definition of "political committee" with regard to the $837,502 in personal donations he received.

c.    Definition of Continuing Political Committee

Eyman argues that even if he was a political committee, he was not a *continuing* political committee because he is an individual, not an "organization" as required in former RCW

42

42.17A.005(12). He asserts that the term "organization" does not include an individual. We disagree.

Former RCW 42.17A.005(37) defines "political committee" as a "person," which includes an individual. But former RCW 42.17A.005(12) defines a "continuing political committee" not as a person but as an "organization." The use of the term "organization" in former RCW 42.17A.005(12) suggests that the legislature intended that the definition of "continuing political committee" would not include any "person." "When the legislature uses two different terms in the same statute, courts presume the legislature intends the terms to have different meanings." *Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 173 P.3d 885 (2007).

The FCPA does not define "organization." But the plain meaning of the term does not include a single individual. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1590 (2002) (defining "organization" as "a group of people"). Therefore, Eyman's argument that he individually cannot be a continuing political committee is reasonable.

However, as stated above, Eyman's receipt of personal contributions made him a political committee. As a result, he no longer was merely an individual – he was a *committee*. The plain meaning of organization includes a committee. For example, under RCW 42.17A.205(1), a political committee must file a "statement of organization" with the PDC. Therefore, the conclusion that an individual who constitutes a political committee can constitute an organization and therefore a continuing political committee also is reasonable.

Once again, providing a broader definition of "organization" and therefore of "continuing political committee," is consistent with legislative intent and better advances the legislature's purpose in enacting the FCPA. In addition, we must liberally construe FCPA provisions. RCW 42.17A.001. This liberal construction also would support a broader definition of "organization"

43

No. 56653-2-II

and "continuing political committee." Therefore, we conclude that Eyman as a political committee met the definition of "continuing political committee."

Accordingly, we conclude that Eyman falls within the definition of "continuing political committee" in former RCW 42.17A.005(12).

7.    Reporting Obligations

As a political committee, Eyman had a statutory obligation to file a statement of organization, RCW 42.17A.205(1), and report all contributions and expenditures, RCW 42.17A.235(1)(a). And as a continuing political committee, Eyman was required to file and report on the same conditions and at the same times as a political committee. RCW 42.17A.225(1).

Eyman did not register and did not report any of the personal contributions that he received. Therefore, we hold that the trial court did not err in concluding that Eyman violated the FCPA with regard to those contributions, resulting in maximum penalties of $10,000 for the failure to register, $29,750 for late registration, $580,000 for the continuing failure to report contributions, $857,502 for the amount not reported, $1,240,000 for the failure to file monthly C-3 and C-4 reports, and $2,124,910 for the continuing failure to file reports.

H.    CONSTITUTIONAL CLAIMS

Eyman argues that the FCPA is unconstitutional as applied to him because it (1) unconstitutionally requires him to disclose the identity of charitable donors, and (2) subjects him to unconstitutionally oppressive reporting requirements. We disagree.

1.    Legal Principles

The FCPA's reporting and disclosure requirements are subject to exacting scrutiny, not strict scrutiny. *GMA* I, 195 Wn.2d at 461. Under the exacting scrutiny analysis, there must be a

44

" 'substantial relationship' " between the statutory requirement and a " 'sufficiently important' " governmental interest. *Id.* (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366-67, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010)).

"It has already been held that the FCPA's registration and disclosure requirements for political committees survive exacting scrutiny on their face 'because the [FCPA]'s somewhat modest political committee disclosure requirements are substantially related to the government's interest in informing the electorate.' " *GMA* I, 195 Wn.2d at 461-62 (quoting *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1014 (9th Cir. 2010)). Therefore, Eyman is limited to an as-applied challenge. *See id.* at 462.

In an as-applied challenge, "the State's interest in disclosure is ordinarily sufficient to survive exacting scrutiny." *GMA* I, 195 Wn.2d at 464. However, the court in *GMA* I recognized the line of cases allowing as-applied challenges if the disclosure of donors' identities probably would subject them to threats or harassment. *Id.*

2. Disclosure of Donors

Eyman argues that he has a First Amendment right to solicit and use charitable donations without disclosing the names of the donors, and the FCPA's requirement that a political committee disclose the source of all donations violates that right. However, Eyman provides no exacting scrutiny analysis or any other explanation of why the FCPA's disclosure requirements are not substantially related to the State's well-recognized interest in informing the electorate. And he does not argue that disclosing the names of donors would subject them to threats or harassment. Therefore, we reject this argument.

No. 56653-2-II

### 3. Oppressive Reporting

Eyman argues that forcing him to comply with the FCPA's reporting requirements for political committees is oppressive and unconstitutional as applied to him. We disagree.

Eyman relies on *Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. 238, 107 S. Ct. 616, 93 L. Ed. 2d 539 (1986) (MCFL), to support this proposition. In that case, MCFL was incorporated as a non-profit that did not accept contributions from business corporations or unions, as its resources came from members and fundraising activities. *Id.* at 241-42. MCFL routinely sent out newsletters, and in 1978 it sent out a "Special Edition" before the primary elections providing information about voting pro-life and stating that "[n]o pro-life candidate can win in November without your vote." *Id.* at 243.

The Court ruled that the "Special Edition" was an expenditure of funds that fell within § 441b of the Federal Election Campaign Act's definition of expenditure. *Id.* at 246. The Court then turned to the constitutionality of the provision as applied. *Id.* at 251.

Because MCFL was incorporated, it was required to establish a "separate segregated fund" if it wished to do any independent spending whatsoever. *Id.* at 253. And because having such a fund qualified an entity as a political committee under the Act, all of MCFL's independent expenditures would be regulated as it was furthering candidates. *Id.* This meant that it had to comply with a plethora of requirements than it would have if it were not incorporated. *Id.* at 254-55.

Applying strict scrutiny, the Court concluded that "while § 441b does not remove all opportunities for independent spending by organizations such as MCFL, the avenue it leaves open is more burdensome than the one it forecloses. The fact that the statute's practical effect may be to discourage protected speech is sufficient to characterize § 441b as an infringement on

46

No. 56653-2-II

First Amendment activities." *Id.* at 255. And if MCFL spent as little as $250, it would trigger the disclosure provisions of § 434, which would provide enough information necessary to monitor MCFL's spending and contributions without subjecting them to the numerous regulations that accompany a political committee. *Id.* at 262. The Court concluded that there was no need for the purpose of disclosure to treat MCFL any differently than others who spent independently on behalf of candidates. *Id.*

*MCFL* is distinguishable. Here, the facts are different and the government has much more of an interest in ensuring transparency in campaign finance. Although there was no compelling justification in *MCFL,* the FCPA's reporting and disclosure requirements survive exacting scrutiny. *GMA* I, 195 Wn.2d at 461. The FCPA does not treat Eyman any differently than another entity subject to reporting requirements in his position as in *MCFL.* The justification for requiring complete disclosure and transparency applies equally across all entities. Finally, the FCPA reporting requirements are not as onerous as in *MCFL.*

We hold that the FCPA is not unconstitutional as applied to Eyman.

I.      VALIDITY OF INJUNCTION

Eyman argues that the injunction is not authorized by the FCPA, violates the First Amendment, and is vague and overbroad. We agree that the FCPA does not authorize two injunction provisions, but either decline to address or reject Eyman's constitutional arguments.

1.    FCPA Authorization

RCW 42.17A.750(1)(i) states, "The court may enjoin any person to prevent the doing of any act herein prohibited, or to compel the performance of any act required herein." Eyman claims that there is no statutory basis for many of the injunction prohibitions, but he presents argument regarding only two: (1) prohibiting him from misleading potential donors as to why

47

No. 56653-2-II

they should donate to a political committee or how any donations will be spent, and (2) prohibiting him from receiving payments from vendors who provide services to political committees with which he is associated.[7] We agree that the FCPA does not authorize those injunction provisions.

Misleading potential donors obviously is improper and may be illegal. But the State does not point to any provision of the FCPA that prohibits a person from misleading potential donors. Similarly, the State points to no provision of the FCPA that prohibits a person from receiving payments from vendors. The FCPA certainly prohibits concealing such payments and may require the payments to be reported, but the injunction is not limited to concealing or failing to report vendor payments.

Because these two injunction provisions do not enjoin Eyman from doing acts prohibited in the FCPA, we remand for the trial court to strike these two provisions.

2. Constitutionality of Injunction

Eyman argues that the injunction infringes on his First Amendment rights and that the injunction is vague and overbroad. Two of the injunction provisions that Eyman references are the two provisions we hold are not authorized by the FCPA. Therefore, we need not address the constitutional arguments regarding those provisions.

Eyman also claims that the injunction prohibits him from seeking charitable assistance, which violates his First Amendment right to do so. He cites to *City of Lakewood v. Willis*, which stated that "[t]he First Amendment protects 'charitable appeals for funds.' " 186 Wn.2d 210, 217,

---

[7] We decline to consider whether the FCPA authorizes any of the other injunction provisions because Eyman presents no meaningful argument regarding them. *Billings*, 2 Wn. App. 2d at 21.

No. 56653-2-II

375 P.3d 1056 (2016) (quoting *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632, 100 S. Ct. 826, 63 L. Ed. 2d 73 (1980)).

But the injunction does not prohibit Eyman from soliciting contributions for himself. It requires that if Eyman solicits personal donations for his political work, he must establish a political committee, report all contributions, and ensure that the donations are made to the committee and not directly to himself. Eyman does not explain how these requirements – which do not prevent him from seeking charitable assistance – violate the First Amendment under the circumstances of this case. We reject Eyman's argument.

And we decline to address the constitutionality of any of the other injunction provisions because Eyman makes no meaningful argument regarding them. *Billings*, 2 Wn. App. 2d at 21.

J.     EXCESSIVE FINES CLAUSE

Eyman argues that the $2.6 million penalty the trial court imposed on him should be reversed because it violates the excessive fines clause in the United States and Washington constitutions. We conclude that we cannot determine on this record whether the penalty violated the excessive fines clause.

1.     Legal Principles

"Both the Eighth Amendment to the United States Constitution and article I, section 14 of the Washington Constitution prohibit excessive fines." *GMA* II, 198 Wn.2d at 897-98. The excessive fines clause limits the State's power to extract cash payments as punishment for an offense. *City of Seattle v. Long*, 198 Wn.2d 136, 159, 493 P.3d 94 (2021). "[A] fine is excessive 'if it is grossly disproportional to the gravity of the defendant's offense.'" *GMA* II, 198 Wn.2d at 899 (quoting *United States v. Bajakajian*, 524 U.S. 321, 334, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998)).

49

No. 56653-2-II

We consider four factors to determine whether a fine is grossly disproportional: " '(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused.' " *GMA* II, 198 Wn.2d at 899 (quoting *GMA* I, 195 Wn.2d at 476). However, we also must consider a person's ability to pay the fine. *GMA* II, 198 Wn.2d at 899; *see also Long*, 198 Wn.2d at 168-73. We review de novo whether a fine is excessive. *GMA* II, 198 Wn.2d at 899.

The court in *GMA* II addressed a $6 million base penalty that was trebled to $18 million for a political committee's violation of reporting requirements under the FCPA. *Id.* at 896. After analyzing the four factors, the court concluded that the penalty was not grossly disproportional to the offense. *Id.* at 899-907. In *Long*, the court held that a fee of $547.12 to retrieve an impounded vehicle in which the defendant lived was excessive when the evidence conclusively showed that the defendant was experiencing homelessness, had minimal income, and could not afford to pay the fee. *Id.* at 174-76.

2.   Analysis

Initially, Eyman argues that the $2.8 million in attorney fees and costs must be considered part of the penalty imposed on him. We disagree. The penalties authorized under the FCPA are itemized in RCW 42.17A.750. Attorney fees are not listed as a penalty. Instead, RCW 42.17A.780 contains a separate provision authorizing the award of attorney fees.

Application of the four-factor test shows that the penalty imposed on Eyman was not constitutionally excessive. First, Eyman committed multiple FCPA violations over several years, failing to provide hundreds of reports during that time. The trial court stated, "[I]t would be

50

No. 56653-2-II

difficult for the Court to conceive of a case with misconduct that is more egregious or more extensive than the misconduct committed by Defendant Eyman in this matter." CP at 4967.

Second, Eyman engaged in three separate activities that resulted in FCPA violations: receiving $308,185 from Citizen Solutions, loaning $200,000 to Citizens in Charge, and receiving over $800,000 in personal donations that he failed to report. The trial court concluded that "Eyman's violations of the FCPA are numerous and particularly egregious." CP at 4965.

Third, the trial court found that the maximum amount of penalties that could be imposed under the FCPA was over $5.75 million. The court imposed less than half of that amount. In addition, the court declined to treble the penalty as authorized under RCW 42.17A.780.

Fourth, the harm is difficult to quantify. But the court in *GMA* II stated that the failure to disclose contributors in that case caused "substantial harm" that "struck at the heart of the principles embodied in the FCPA." 198 Wn.2d at 904. "Voters are entitled to know who is contributing to political committees and paying for political campaigns by name." *Id.*

Eyman's primary argument is that regardless of the four-factor analysis, the penalty imposed on him is excessive because he does not have the ability to pay it. The Supreme Court in *Long* stated, "The central tenant of the excessive fines clause is to protect individuals against fines so oppressive as to deprive them of their livelihood." 198 Wn.2d at 171.

Here, the trial court did not address Eyman's ability to pay the $2.6 million penalty. Eyman attempted to testify about his personal finances, but the trial court sustained the State's objection to this line of questioning. We can take judicial notice that Eyman filed for bankruptcy during this proceeding,[8] but a bankruptcy filing does not necessarily mean that Eyman has no ability to pay the penalty.

---

[8] Case No. 18-14536-MLB (W.D. Wash.).

51

No. 56653-2-II

In the absence of any evidence regarding Eyman's ability to pay the $2.6 million penalty, we cannot conduct our de novo review under the excessive fines clause. We have no choice but to remand this case to the trial court to take evidence regarding Eyman's ability to pay and to adjust the penalty if necessary to comply with the excessive fines clause.

K.      AWARD OF ATTORNEY FEES TO STATE

Eyman argues that we should reverse the trial court's award of attorney fees to the State because RCW 42.17A.780 does not allow the State to recover attorney fees. We disagree.

RCW 42.17A.780 states,

> In any action brought under this chapter, the court may award *to the commission* all reasonable costs of investigation and trial, including reasonable attorneys' fees to be fixed by the court. . . . If the defendant prevails, he or she shall be awarded all costs of trial and may be awarded reasonable attorneys' fees to be fixed by the court and paid by the state of Washington.

(Emphasis added.) This statue was enacted in 2018. LAWS OF 2018, ch. 304, § 17.

Before 2018, the FCPA attorney fee provision was contained in former RCW 42.17A.765(5) (2010). That provision stated that the court could award attorney fees "to *the State*" in any FCPA action. Former RCW 42.17A.765(5) (emphasis added).

Eyman argues that RCW 42.17A.780 now allows only the PDC to recover attorney fees, not the State as formerly was allowed under former RCW 42.17A.765(5). He claims that the legislature's use of different language shows an intent to limit the award of attorney fees to the State. The State argues that only the AGO is authorized to litigate on behalf of the PDC. Former RCW 42.17A.765(1)(a). Therefore, an attorney fee award to the PDC under RCW 42.17A.780 must also include an award to the State.

We interpret RCW 42.17A.780 as allowing an attorney fee award to the State in an FCPA action when the State is suing on behalf of the PDC. In *GMA* I, the Supreme Court granted the

52

No. 56653-2-II

State's request for an attorney fee award under former RCW 42.17A.765(5). 195 Wn.2d at 477. The court then stated "*See also* RCW 42.17A.780." This citation suggests that the State also would have been entitled to attorney fees under RCW 42.17A.780. In addition, we are required to liberally construe the provisions of the FCPA. RCW 42.17A.001.

Therefore, we hold that the trial court did not err in awarding attorney fees to the State.

L.      ATTORNEY FEES ON APPEAL

Both Eyman and the State request that we award attorney fees to them on appeal under RCW 42.17A.780. Because the State is the predominantly prevailing party, we award attorney fees to the State.

CONCLUSION

We affirm in part and reverse in part the trial court's final judgment, and remand for the trial court to (1) vacate the conclusion that Eyman violated the FCPA by failing to report the $103,000 payment he received from Citizens in Charge, (2) strike the injunction provisions prohibiting Eyman from misleading potential donors and receiving payments from vendors, and (3) consider Eyman's ability to pay the penalty imposed and to adjust the penalty if necessary to comply with the excessive fines clause.

_____
MAXA, J.

We concur:

_____
LEE, J.

_____
CRUSER, A.C.J.

53